The determination of what was the fair value of a piece of land taken for public purposes would seem to present a very proper occasion for the chancellor to have the benefit of the opinion of a disinterested jury. The jurors of this court are drawn from all parts of the district, and not simply from the locality in which the property is situated; in fact, a very small percentage of them may come (if any actually at the trial do come) from that locality. It would not appear, therefore, that any cause of objection to a jury on the ground of interest or local favoritism would exist against the jurors to whom the issue should be presented.

For all these reasons, it is ordered and adjudged that it shall be submitted to a jury at the next term of this court, or at any term thereafter, as soon as it can conveniently be tried, to determine in this case the following issue, viz.: What, on April 5, 1918, was the fair and reasonable value which would constitute a just compensation to be paid for the taking for public purposes of the lands mentioned and described in the petition herein?

---

## HOUSTON ELECTRIC CO. v. CITY OF HOUSTON et al.

(District Court, S. D. Texas, at Houston. March 13, 1920.)

No. 110.

1. **Carriers &em;18(1)—Courts can interfere with rates only if they are unremunerative.**

    The fixing of street railway fares, involving considerations of expediency, policy, and fairness, rests with the rate-making body, and the courts can interfere only when it is established that the rate fixed denies a fair return upon the reasonable value of the property devoted to public use.

2. **Carriers &em;12(5)—Facts affecting reasonableness of rates stated.**

    The reasonableness of street railway rates fixed by a city council depends upon the reasonable value of the property employed in the public service, the gross income, the operating expenses, including taxes and repairs, depreciation, a fair rate of return, to which the company is entitled, and the rate of return actually received under the fares as fixed.

3. **Carriers &em;12(5)—Valuation on which rate is allowable is not sale valuation.**

    The value adopted for rate-making purposes is not determined by the same processes that would be applied for sale or condemnation purposes, but is the value fair to the utility and the public, as determined from all the circumstances on which a return should be permitted.

4. **Carriers &em;12(5)—Entitled to return on increased valuation.**

    A street railway company is entitled to a return on the increased valuation of its property over the cost price, since it must also suffer the loss from any diminution of value.

5. **Carriers &em;12(5)—Fair rate of return depends on existing interest rates in community and security of investment.**

    No fixed rate of return on investment in public utilities can be accepted, but the rate is to be determined from the consideration of the prevailing interest rates in the community and the security of the investment.

In Equity. Suit by the Houston Electric Company against the City of Houston. Master's report, recommending decree for complainant, approved.

---

&em;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The report of Otis K. Hamblen, master in chancery, here follows:

To the Honorable J. C. Hutcheson, Jr., Judge Presiding:

In accordance with the order of court referring to the undersigned master the matter of taking testimony in this cause, with direction to report thereon witn recommendations, a series of hearings were had until both parties had concluded the presentation of evidence, with full discussion thereof. The master now files this report thereon, with findings and recommendations, together with a transcript of the testimony, and, as references, the reports of the several engineers, exhibits, and briefs of counsel, so that there is now before the court all sources of information considered by the master.

*Nature of suit.*—The order of reference is general in its terms, but the pleadings in the case disclose that the sole purpose of plaintiff's bill is to seek an injunction against defendant from enforcing its ordinance that makes it unlawful for plaintiff, in operating its street railway system, to charge more tnan 5 cents for. an adult passenger and 2½ cents for children within certain ages. The ground upon which the injunction is sought is that the restricted rate of fare affords it a return so inadequate with respect to the value of its plant as to constitute a taking of its property for public use without just compensation, in violation of the Fourteenth Amendment to the Constitution of the United States.

[1] *Question at Issue.*—The master has kept in mind the settled principle that the fixing of rates, involving considerations of expediency, policy, and fairness under existing conditions as between the utility and the public, rests with the rate-making body, being in this instance the city council, and that the right of judicial interference attaches only when it is established that the rate fixed denies to the utility a fair return upon the reasonable value of its property that is put to public use, and, accordingly, that the scope of the inquiry is limited to the testing out of the rate of fare allowed, in order to determine whether or not it results in the prohibited taking of plaintiff's property, and does not embrace authority for binding the rate-making body to any particular plan for fixing fares other than, in the operation thereof, plaintiff shall be enabled to realize the fair return protected by the constitutional provision.

[2] *Method of Determining the Issue.*—The solution of the question, as interpreted in the Supreme Court decisions, involves the following fact findings: (1) The reasonable value of plaintiff's property employed in the public service. (2) The gross income yielded in the operation of such property. (3) The expenses incurred in such operation, including taxes and such repairs as become necessary to keep the property in serviceable condition. (4) Proportionate amount required to provide gradually for replacement of property or compensation to owner at the end of the life of such property. (5) The fair rate of return which plaintiff should receive. (6) The rate of return actually received under the limited fare. From these fact findings the conclusion follows as to whether or not the operation of plaintiff's property under the fare allowed results in its confiscation within the meaning of the Constitution.

[3] *Method of Finding Value.*—It is the accepted rule that for rate-making purposes the consideration of value does not involve the same processes and degrees of exactness that would be applied for sale or condemnation purposes, but is concerned with determining from all the circumstances that valuation which, on the one hand, would be fair to the utility and upon which it should be permitted to earn the fair rate of return for employing its property to public use, and, on the other hand, would be fair to the using public in exacting from it only the reasonable value of the use of such property. The authorities prescribe no one method for determining this value, but state that each case must be governed by its own particular facts. They do direct, however, that in ascertaining this·value consideration shall be given to the original cost of construction, the present as compared with the original cost of construction, local conditions and other elements, and from such consideration of all the relevant facts the value for rate making shall be determined. In the hearing before the master evidence was fully developed along the lines indi-

cated in the authorities, and all relevant facts in the record were considered by the master in arriving at a conclusion.

*Cost Method.*—It was shown that the records of plaintiff company have been preserved, and that they were kept in such manner as fairly to reflect the cost of plaintiff's property. During the construction of four-fifths of the property, it is admitted that the records were kept accurately and in accordance with approved methods; so that from the records it may be determined with reasonable certainty the amounts expended by plaintiff in the property, and by its predecessors in title. An accurate and complete inventory of plaintiff's property was made in 1918, and prices applied to the items that prevailed at the time of acquisition thereof (as determined from the records and historical data), thus constituting a check or guide as to the correctness of the book costs.

Using round numbers for convenience, the records reflect the cost of the physical property, undepreciated, and excluding land, at $4,984,300; land at $67,700—totaling $5,052,000. To this is to be added the item for working capital, which embraces items required to be on hand in the operation of the property, such as materials, supplies, and cash. These items are customarily allowed, and were allowed by all witnesses in this case; the only criticism being that the cash item should not be allowed in the full proportion as is ordinarily done, because of the fact that this particular utility receives daily reimbursement from fares and tickets on its outlay. Even with such suggestion taken into consideration, an allowance of $200,000 for working capital is sustained by the record and finds no complaint therein.

An item that the authorities hold is an element of value constituting a property right that must be considered in determining the value upon which the utility shall be permitted to realize a fair return is one variously termed "going value," "going concern value," "cost of establishing business," or "development cost." The item will be referred to in this report as development cost. No fixed method for determining development cost, has been attempted by the authorities, for obvious reasons, but it is held that each case must be controlled by its own circumstances. The allowance in its larger sense is designed to give the owner the benefit of that value that inheres in his plant as an established concern, already operating and earning, with a trained organization, having knowledge of the business, its requirements, and best proven methods for meeting them, and embodying all the experience of the past, with the known results of experiments made, and how best to adapt the business to the changing needs of a growing community. Partly in detail, the development cost embraces preliminary outlays and unrecovered costs in operating the plant itself until a paying business has been established, and subsequently for extensions into sparsely settled territory, until the growth of that particular section affords an adequate return. This cost continues with the continued extension and development of the plant.

It is evident that development cost for a street railway plant is greater than for the ordinary public utility, because in extending its plant it must at the time, with negligible patronage, perform the same construction work and provide the same equipment and facilities that would care for a large patronage that may long be deferred, whereas most other utilities may be governed in large measure in their outlays for extension work by the existing demand for the service. All of the witnesses in the case allowed development cost. Mr. Gillette, witness for plaintiff, gave as his final development cost the sum of $1,900,000, but in his computations he used over an early but long period of time 10 per cent. as a fair rate of return. He testified that 20 per cent. of the value of the physical property would represent a fair development cost. Mr. Hagenah, witness for plaintiff, gave as his final development cost the sum of $1,300,000, using 8 per cent. as a fair return. He testified that development costs allowed by courts and commissions in cases within his knowledge varied from 10 to 30 per cent. of the value of the physical property. The development cost under the method used by Mr. Lyndon, witness for defendant, amounted to $1,100,000. He used 8 per cent. as a fair return, but began with values in 1896. His method worked back of that date would appreciably increase the amount. Bearing in mind the rates adopted by the witnesses as

a fair measure of return, and that the development cost of this particular utility is above the average, and considering the average percentage basis usually obtaining, the sum of $1,300,000 is fair for development cost.

From the total items of value set forth above a deduction must be made for the depreciated condition of the property. The record evidence of the age of the property, with a percentage basis of its average life, together with testimony of an actual and thorough inspection of the property and appraisal of its condition, shows a condition of depreciation approximating 20 per cent. This evidence was given by plaintiff's witnesses, and in its application in dollars is about the amount that the defendant's witness agreed should be deducted. Twenty per cent. of the depreciables amounts to $996,800.

Restating the several items shows the value by this method as follows:

| | |
|---|---:|
| Physical property, undepreciated and excluding land | $4,984,300 |
| Land | 67,700 |
| Working capital | 200,000 |
| Development cost | 1,300,000 |
| | $6,552,000 |
| Depreciation | 996,800 |
| | $5,555,200 |

Stating in similar manner the 1918 inventory priced out, as hereinbefore indicated, shows the following result under that method:

| | |
|---|---:|
| Physical property, undepreciated. and excluding land | $4,731,600 |
| Land, using present value | 255,300 |
| Working capital | 200,000 |
| Development cost | 1,300,000 |
| | $6,486,900 |
| Depreciation | 996,800 |
| | $5,490,100 |

The present value of land, as used in the foregoing statement, was arrived at as the fair average present value of the land from considering appraisals thereof made by four Houston persons shown to be familiar with land values.

Mr. Lyndon, under his method, found as his final value of the property the sum of $5,300,000. In so doing he started with 1896, and his method carried over the entire period would increase such valuation. In his method he sought the original cost as his basis for valuing the property. A rough 1896 inventory and one made in 1901 were also checked out, and afforded support to the book cost of the property as being reasonably correct. On the basis of the original cost of construction, it is manifest from the evidence that $5,500,000 would be the resulting value.

*Trend Price Method.*—Evidence was introduced of value based on what is called trend prices. These prices were obtained by determining the average annual per cent. increase in prices from 1896 to 1914, and projecting such per cent. increase through the year 1918, with the view of ascertaining what the value of the property would be if prices had not been disturbed as a result of conditions brought about by the war. Stated upon that basis, the following result is found:

| | |
|---|---:|
| Physical property, undepreciated, excluding land | $5,010,800 |
| Land, upon finding of present value | 255,300 |
| Working capital | 200,000 |
| Development cost | 1,300,000 |
| | $6,766,100 |
| Depreciation | 1,000,000 |
| | $5,766,100 |

*Present Cost Method.*—Evidence was submitted of value upon the basis of reproducing the plant. It was shown that present prices are approximately 100 per cent. above the prewar level. But present prices were not used, under the supposition that the present level would be lowered gradually. For that reason percentages of present prices varying from 60 to 70 per cent. were taken. It seems a safe assumption that as concerns a public utility for rate making the price level will remain 50 per cent. above the level obtaining at the beginning of the war, and will do so for a rather indefinite period of time.

This theory of valuation assumes that the present plant in its depreciated condition is to be reconstructed at the present time, and, of necessity, presupposes conditions as they now exist, with the city built up, thickly populated, and in need of such plant, so that the present patronage would be available when the plant is put in operation. Therefore it would seem that no appreciable development cost would be incurred, at least to such a comparatively negligible extent as should exclude its consideration under the method being used. Stated upon such basis the value is shown as follows:

| | |
|---|---:|
| Physical property, depreciated, excluding land | $6,059,000 |
| Land | 255,300 |
| Working capital | 200,000 |
| | $6,514,300 |

[4] *Master's Valuation under the Evidence for Rate-Making Purposes.*— It is manifest that plaintiff's property is worth more than the amount invested therein. Under the authorities, plaintiff is entitled to its fair return upon the increased value upon the proposition seemingly reasonable that, as plaintiff must bear the burden of adversity, it is entitled in fairness to the benefit of favorable conditions, and that as the public is using the property with its existing value it should in justice pay a fair return thereon. There is no requirement in the authorities or reason to confine plaintiff strictly to the cost basis.

It is equally manifest that it would be unfair to the public to require it to pay upon a valuation based upon present prices under the unsettled conditions. In the short space of time mentioned, prices advanced 100 per cent., under unprecedented conditions. Just what level prices will settle upon through the processes of readjustment is necessarily speculative. No contention was made in the case that existing prices should be applied. On the contrary, percentage prices were used. Under the reproduction method, in addition to the cost of labor and material, various items of cost are added under the heading of overheads. These items inhere in construction work, but are affected by local conditions, and may or may not be incurred in whole, and may or may not be incurred in the amounts assumed. In the evidence given they were adduced upon a percentage basis, derived from experience and study of construction work, but of necessity remain problematical in part. In estimating the value upon the high percentage of prices used, it is apparent that the public might be required to compensate for expenditures that would not be incurred, and that it should not be bound strictly by a valuation arrived at by that method.

It would seem, from a consideration of all the facts and circumstances, that by letting development cost and depreciation offset each other, and taking the fair cost of the physical property, and adding to it an increased value deemed fair under existing conditions, a result would be reached which would safeguard plaintiff against the use of its property for an inadequate return, and would protect the public against paying excessively for such use. In this view, the sum of $6,000,000 is found as the proper valuation.

*Gross Earnings.*—The gross earnings from the operation of the property during the year 1919 amounted to $1,752,775.

*Expenses.*—The operating expenses and taxes for the year 1919 amounted to $1,446,135.

*Depreciation Annuity.*—All of the testimony shows 4½ per cent. of the value of depreciable property as the proper allowance annually for taking care of such property at the end of its life.

[5] *Fair Rate of Return.*—The authorities hold that no fixed rate of return may be accepted as the fair rate, but that same is governed by conditions existing in the community where the inquiry is being made, and should be considered in connection with returns upon investments of similar or other securities. The legal rate as fixed by statute at 6 per cent. Well-secured mortgages on real estate, free from risk, yield from 6 to 7 and upward, depending upon the value and desirability of the security and element of risk. All of the witnesses in the case used 8 per cent. as the fair rate of return. They all agree that the operation of a street railway property is attended with risks that do not attach to the ordinary security, and that the greater the risk the greater the return rule should apply. The cost to plaintiff in obtaining necessary capital is a factor also to be considered. It was shown that in April, 1919, the procuring of $700,000 by plaintiff for its needs cost it in excess of 9 per cent., and that same was procured at a favorable time and under the most favorable terms practicable. With well-secured investments, free from risk, yielding 6 and 7 per cent., and other comparatively free from risk yielding 8 per cent., it follows that a fair rate of return to plaintiff would be 8 per cent.

*Rate of Return Actually Received by Plaintiff.*—Under the cost method, which affords the lowest valuation of any of the methods employed, plaintiff, after paying operating expenses and taxes and providing the required depreciation annuity, would receive on that valuation approximately 1.75 per cent. Under the other methods employed, which afford valuations higher than the cost method, the return to plaintiff would be fractionally less than the 1.75 per cent. Under the valuation found by the master the return would be approximately 1.50 per cent.

*Conclusion.*—As held by the authorities (Covington Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Reagan v. Farmers' Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Denver Water Co. Case, 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649), and as sustainable by every sentiment of fairness, it follows that the restricting of plaintiff to the fare as limited in the ordinance affords a return upon the value of its property so inadequate as to constitute the taking of its property for public use without just compensation.

H. M. Garwood and C. R. Wharton, both of Houston, Tex., and William E. Tucker, of Boston, Mass., for plaintiff.

W. J. Howard and Kenneth Krahl, both of Houston, Tex., for defendants.

HUTCHESON, District Judge. There being no exceptions to the master's report, his conclusion as to the confiscatory nature of the ordinance attacked is approved and injunction will issue as per decree file.

---

**PAUL JONES & CO. v. MAYES, Collector, etc.**

(District Court, W. D. Kentucky. January 10, 1920.)

1. **Evidence** ⟪⟫20(1)—Court judicially knows whisky may contain charcoal from the barrels in which stored.

It is matter of common knowledge, and therefore judicially known, that whisky is stored in warehouses in barrels charred on the inside, and that particles of charcoal may drop from the staves into the spirits during the storage, which it is desirable should be removed.

⟪⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes